Steven R Sumsion (#8317)
**SUMSION BUSINESS LAW**
1800 Novell Place, 5th Floor
Provo, UT 84606
Tel: (801) 375-2830
Email: steve@businesslawutah.com
*Attorney for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| **ENEVIVE**, **LLC**, a Utah Limited Liability company,<br><br>    Plaintiff,<br><br>v.<br><br>**BLUELOGIC**, **LLC**, a Utah Limited Liability Company, **CHRISTOPHER (TOPHER) SCHEELER,** an individual, **ROBERT HEINRICH ADAMS**, an individual, **CHRISTOPHER WATSON**, an individual, **TREVOR LEE**, an individual, **JARED BAYLESS**, an individual, and **DOES 1-10.**<br><br>    Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Civil No.: 2:25-cv-00796-TC-CMR<br><br>Judge: Tena Campbell<br>Magistrate Judge: Cecilia M. Romero<br><br><br>**JURY DEMANDED** |

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff Enevive, LLC

("Enevive"), by and through counsel, hereby complains against Defendant BlueLogic, LLC

("BlueLogic"), Christopher (Topher) Scheeler ("Scheeler"), Rob Adams ("Adams"), Christopher

Watson ("Watson"), Trevor Lee ("Lee"), Jared Bayless ("Bayless"),  and John Does 1-10

(collectively "Defendants") as follows:

1

## NATURE OF THE ACTION

This is an action to recover damages and to enjoin the unlawful operation of "Enevive 2.0." Enevive is a premier water purification and consulting service business, that tests water, sells, installs, and maintains custom water purification systems for residential and light commercial use.  Scheeler, Adams, Watson, and Bayless were previous employees of Enevive. Each was subject to non-disclosure agreements and an implied understanding that they would act in Enevive's best interests while employed by Enevive. But, while employed by Enevive, these four individuals conspired to form BlueLogic, a company designed to be in direct competition with Enevive. Defendants have admittedly created a directly competitive business and made references to "Enevive 2.0." Accordingly, Enevive requests injunctive relief to prevent imminent and irreparable harm to its business and misuse of trade secrets, and pleads for damages caused by Defendants' misappropriation, conversion, unfair competition, breach of confidential agreements, and otherwise unlawful conduct

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Enevive, LLC, is a Utah Limited Liability Company with its principal place of business in Pleasant Grove, Utah.

2.      Defendant BlueLogic, LLC, is a Utah Limited Liability Company with its principal place of business in Saratoga Springs, Utah.

3.      Defendant Christopher (Topher) Scheeler is a resident of the State of Utah, with a home address of 10871 N Town Center Park W. Highland, Utah 84003.

4.      Defendant Robert Heinrich Adams is a resident of the State of Utah, with a home address of 12116 S. Spring Wheat Circle, Riverton, Utah.

2

5. Defendant Christopher Watson is a resident of the State of Utah, with a home address of 782 Pratt Lane 303, Saratoga Springs, Utah 84045.

6. Defendant Trevor Lee is a resident of the State of Utah, with a home address of 1321 East Daffodil Court, Layton, Utah 84040.

7. Defendant Jared Bayless is a resident of the State of Utah, with a home address of 1779 W. Ridgeline Road Unit 120, Stockton, Utah 84071.

8. John Does 1-10 are unknown entities or individuals who may be party to this Complaint

9. This Court has subject matter jurisdiction over civil actions brought under 18 U.S.C. § 1836(b) and 15 U.S.C. § 1125(a) pursuant to 28 U.S.C. § 1331.

10. Enevive's state law claims share a common nucleus of operative fact such that they constitute the same case or controversy with Enevive's claims under 18 U.S.C. § 1836(b) and 15 U.S.C. § 1125(a). As such, this Court can exercise Supplemental Jurisdiction pursuant to 28 U.S.C. § 1367(a) over Enevive's state law claims.

11. Venue is proper in this District pursuant to 28 U.S. Code § 1391(b)(2), as the events of the complaint arose in Utah County and surrounding areas.

### **FACTUAL BACKGROUND**

12. Founded in 2017, Enevive is a water purification and consulting service business that tests, installs, and maintains custom water purification systems for residential and light commercial use.

3

13.    Enevive sells its product throughout the United States, and has customers in several states, including, but not limited to, Utah, Idaho, Arizona, Ohio, California, Hawaii, Iowa, and Virginia.

14.    Enevive has its own proprietary business information and methods, including without limitation:

a.  research conducted by Enevive on water filtration in residential areas;

b.  Envive's engineering designs for custom residential filtration systems such as Enevive's Ultimate Water Protocol (Full House Purification) High Capacity Reverse Osmosis Systems;

c.  installation of flow through emergency water storage, continually rotated with use to the home;

d.  a unique and Enevive specific sales methodology including virtual meetings and customer education on the dangers of water softeners;

e.  price points and cost configurations of full home purification using Enevive's technology;

f.  a firm specific customer list; and

g.  an Enevive specific nationwide expansion plan approaching brand partners who are initially approached for a first installation of Enevive products and then later are developed into brand partners who then generate leads for Enevive.

15.    This proprietary information is unique in the water purification industry and not used by other companies therein, giving Enevive a distinct advantage in the marketplace,

allowing them to be recognized by the "Best of State" organization in Utah for the past four years.

16.     Enevive works to keep this information secret through means such as requiring employees to sign non-disclosure agreements and maintaining companywide confidentiality policies that all employees must follow.

17.     As part of its marketing strategy and online presence, Enevive maintains a website to demonstrate in general its product and business purposes. Screenshots of the homepage of Enevive's website (enevive.com) prior to Enevive filing this action are included below.







18.     Enevive has consistently grown in revenue and profit since its inception, generating over $3M in revenue in 2024.

**HIRING  SCHEELER, ADAMS, WATSON, LEE, AND BAYLESS**

19. Given the growth Enevive has experienced since its formation, starting in 2024, Enevive hired a series of individuals with the goal of using their expertise to streamline and expedite that growth. Each of these individuals lacked prior experience in the home water purification industry.

20. The first of these individuals, Adams, was hired on March 11, 2024.

21. Adams approached Enevive seeking employment and was later hired to to build a sales team, to improve business operations, and to increase lead generation.

22. Adams' title at Enevive was "Sales Manager," and his responsibilities included without limitation:

   a. recruiting, interviewing, hiring, and training new sales reps;

   b. motivating and inspiring sales reps to higher levels of sales performance;

   c. generating additional sales through promoting Enevive through Adams' Nonprofit Thanksgiving Heroes (an organization to which Enevive sponsored and donated significant sums);

   d. learning Enevive's proprietary sales methods; and

   e. assisting Enevive's managing members with brand partner relationships across the nation.

23. On March 18, 2024, Adams signed a non-disclosure and non-compete agreement with Enevive, which included obligations to:

   a. "not directly or indirectly divulge, disclose, or communicate any [Enevive's proprietary information] to any third party . . . [except] with the prior written consent of [Enevive]"; and

7

b. "only use the [Enevive's proprietary information] in connection with its business dealings with [Enevive] and for no other purpose without the prior written consent of [Enevive]". *See* Exhibit A.

24. In June of 2024, the second and third of these individuals, Scheeler and Watson, were hired by Enevive.

25. Scheeler and Watson were recommended to the members of Enevive through Adams, who claimed that Scheeler and Watson could generate additional online leads.

26. Initially brought on in a part-time capacity to help with online lead generation, Scheeler eventually negotiated a full-time positions at Enevive based on promises to substantially increase generation and volume of sales leads, with Watson being paid primarily to give Scheeler technical support.

27. Through his newly negotiated positions, Scheeler received access to Enevive's entire front-end and back-end operation, including Enevive's proprietary business information and methods. Watson, as Scheeler's support received the same information. *See* ¶ 14, *supra*.

28. From that point, Scheeler took on a larger role at Enevive. His responsibilities at the company included but were not limited to:

a. implementing specific language in generating new leads for water purification systems;

b. online marketing with Google, Facebook ads, Instagram, and other social media platforms;

c.  helping to design the connections between new leads generated and inputting them into Enevive's customized Customer Relationship Management system (the "CRM System");

d.  documenting Enevive's unique sales processes and strategies for implementation across the country; and

e.  executing decisions made by Enevive's leadership regarding various systems and operations as a company.

29. During his tenure at Envive, Scheeler signed a non-disclosure agreement. Upon information and belief, the hard copy of this contract has been destroyed by Scheeler in an effort to eliminate any evidence of obligations he had after leaving Enevive.

30. On March 3, 2025, Scheeler signed an employment agreement wherein he agreed to abide by the policies listed in the Enevive Firm Employee Handbook, which included policies regarding confidentiality. *See* Exhibit B

31. Watson never held an official title at Enevive, but, like Scheeler, was privy to Enevive's proprietary business information and methods, *see* ¶ 14, *supra*, and his responsibilities mirrored those of Scheeler. *See* ¶ 28, *supra*.

32. In addition to these responsibilities, Watson provided technical expertise which allowed him to customize Enevive's CRM System, to customize Enevive's "Go High Level System" managing Enevive's workflows, and coding for Enevive's lead generation software.

33. Not long after hiring  Scheeler and Watson, Enevive hired Lee on July 1, 2024.

34. Lee's title at Enevive was Consultant, and his responsibilities included without limitation:

a. representing Enevive's brand to potential clients in residential and commercial contexts; and

b. developing relationships with social media influencers for the purpose of partnering with Enevive.

35. On March 18, 2025, Trevor Lee signed an employment agreement wherein he agreed to abide by the policies listed in the Enevive Firm Employee Handbook, which included policies regarding confidentiality. *See* Exhibit C

36. Then, on August 12, 2025, Lee signed a Non-Disclosure Agreement, which provided that he would, among other things:

a. "Not disclose Confidential Information [belonging to Enevive] to any third party without prior written consent;"

b. "Restrict access to Confidential Information [belonging to Enevive] to employees or agents on a need-to-know basis who are bound by confidentiality obligations;"

c. "Protect Confidential Information [belonging to Enevive] with at least the same degree of care as Recipient protects its own confidential information, but no less than reasonable care"; and

d. "expressly agrees not to directly or indirectly share, communicate, transmit, transfer, or otherwise make available any Confidential Information — including, but not limited to, customer leads, pricing, business plans, or other proprietary data — to any of the following individuals or entities **or anyone associated with them** …: **Topher Scheeler, Christopher Watson, Jared Bayless, Rob Adams, or Blue Logic Water LLC.**" *See* Exhibit D (emphasis in original).

37. On December 30, 2024, Bayless signed an employment contract with Enevive, after Scheeler and Watson insisted Bayless be brought on in a full-time capacity.

38. Bayless' title at Enevive was "Client Services Director," *see* Exhibit E, and his responsibilities included without limitation:

a. "Spearhead[ing] . . . Enevive's entire client services department";

b. "installing [Enevive's] various water treatment protocols";

c. "building [Enevive's] installation staff to be able to handle the installs and service of all [Enevive's] clients";

d. "develop strategic ways to maximize each staff members time worked within the Client Services Division";

e. "learn the different water systems";

f. "solve the technical issues facing the growth plan for [Enevive]";

g. "positively contribute to the growth of [Enevive]";

h. "help design and produce [Enevive] RO systems";

i. "help train, motivate and support [Enevive's] current and future installation reps and service reps";

j. "assist Trent Spafford and others in the growth and expansion of [Enevive] (National and local Brand Partners);

k. "be a leader and mentor to other staff members on our team." *See* Exhibit E.

39. Bayless' employment contract included a clause regarding confidentiality, in which he agreed to "not at any time or in any manner . . . divulge, disclose, or communicate any items of Information to any third party without prior written consent of the Employer." *See id.*

11

40.     On December 30, 2024, Bayless signed a separate non-disclosure agreement, reinforcing agreements found in his employment contract but adding the obligation to "take all reasonable precautions to protect the confidentiality" of Enevive's proprietary information, "using at least the same degree of care that it uses to protect its own confidential information." *See id*.

41.     Each Defendant underwent training on Enevive sales and installation methods, teaching them what gave Enevive a unique advantage in the industry.

## DEFENDANTS FORM BLUELOGIC

42.     While Defendants had leadership roles and capacities at the company, they were still subject to the authority of Enevive's managing members, Trent and Teresa Spafford (the "Spaffords").

43.     On September 24, 2024, Adams' employment with Enevive ended after he abruptly resigned during a team meeting.

44.     After Mr. Adam's resignation, and despite not delivering on the promised results related to volume of leads generated, Defendants, Scheeler and Watson, grew noticeably dissatisfied with the Spaffords' leadership of Enevive, leading to conflict within the company.

45.     Scheeler became so dissatisfied he began to make plans to reform Enevive into an organization where he and Watson would have complete control over business decisions, relegating the Spaffords to a position where they would merely have a percentage of the equity of the company while being completely kept out of its day-to-day management. And, if the Spaffords did not go for the plan, he would create his own direct competitor with Watson.

12

46.     Scheeler openly talked about these plans with other Enevive employees, referring to the future organization as "Enevive 2.0."

47.     Scheeler indicated to Enevive employees that as soon as "Enevive 2.0" was established he would give them a job.

48.     While openly talking about these plans with Enevive employees, Scheeler would direct still other Enevive employees to not report or speak with the Spaffords about day-to-day business decisions.

49.     Scheeler would also go beyond his authority by directing the Enevive team to use ideas that were not approved by the Spaffords.

50.     Each of these troubling behaviors of Scheeler would take place out of the Spaffords presence, and there were times when Scheeler would even direct the Spaffords to stay away from the office and allow him to run things.

51.     Scheeler's directives and actions effectively excluded the Spaffords from Enevive's day-to-day business and operational decision making.

52.     Unbeknownst to the Spaffords, on April 29, 2025, while Scheeler, Watson, and Bayless were still employed at Enevive, BlueLogic was formed with Watson as its registered

agent. A screenshot of the listing on the Utah Secretary of State's website is included below.

| | | | |
|---|---|---|---|
| Entity Name: | BLUELOGIC LLC | | |
| Entity Number: | 14568389-0160 | | |
| Entity Type: | Domestic Limited Liability Company | | |
| Entity Subtype: | Limited Liability Company | Formation Date: | 04/29/2025 |
| Profession: | N/A | Formation Effective Date: | 04/28/2025 |
| Entity Status: | Active | Renew By Date: | 04/30/2026 |
| Entity Status Details: | Current | Last Renewed Date: | N/A |
| Status Updated On: | 05/02/2025 | | |

**ENT INFORMATION**

| | |
|---|---|
| Name: | Christopher Watson |
| Registered Agent Type: | Individual |

53.    BlueLogic LLC is a residential water purification business that sells "Whole Home Purification System[s]." Like Enevive, BlueLogic's brand centers around improving water quality for the entire home and aims to inform consumers about the inadequacy of water softeners and filters.

54.    Scheeler and Watson continued to work at Enevive for a month, following the formation of BlueLogic.

55.    Due to his unprofessional behavior, on May 29, 2025, Scheeler was involuntarily terminated after the Spaffords and other Enevive employees confronted him on several issues.

56.    Immediately after Scheeler's termination, Watson resigned from his position, choosing to leave with Scheeler.

57.    Due to Bayless' connection to Scheeler and Watson as they are the ones who recommended his employment, he was asked by the Spaffords if he would stay on at Enevive, and Bayless emphatically asked to stay.

14

58.     But, less than two months later, on July 7, 2025, Bayless resigned without notice, telling the Spaffords he was going back to work with his previous employer.

59.     On or around July 7, 2025, Bayless began working at BlueLogic in more or less the same capacity as he was at Enevive.

**<u>DEFENDANTS' BEHAVIOR SINCE TERMINATION</u>**

*Lead Generation Software Incident*

60.     Leading up to and for a short period after  Scheeler and Watson's termination, Scheeler and Watson continued to have access to Enevive's specific lead generation software.

61.     Enevive's management was unaware that Scheeler and Watson continued to have access to Enevive's software that was used for internal business operations following their termination.

62.     Following the termination of Scheeler and Watson, Enevive experienced a sudden halt in lead generation, which was not a usual occurrence for the company and likely only would occur as a result of interference with the lead generation software.

63.     The halt in lead generation experienced by Enevive was a direct result of technical manipulation by Scheeler and Watson. Specifically, Scheeler and Watson used his technical expertise to impact the code upon which the lead generation software is built, impacting Enevive's number of leads.

*Reaching Out to Enevive Product Partners*

64.     Defendants have actively tried to sell BlueLogic products to multiple Enevive product partners, in violation of covenants not to compete.

65.    In one specific instance, on August 4, 2025, Bayless emailed Kirk Todd, an Enevive product partner in Arizona, with a copy of the BlueLogic installation diagram asking for feedback. A screenshot of this email is included below for reference.



66.    This diagram also bears significant resemblance to Enevive's own product. A picture of this product is included below for reference.

16



**ULTIMATE PROTOCOL INSTALLATION DIAGRAM**

*Lee's Involvement*

67.     Since  Scheeler and Watson were terminated, BlueLogic has recruited Enevive employees to sell BlueLogic products.

68.     Lee, while he was still employed at Enevive made sales calls for BlueLogic, using Enevive's client list and lead generation software to make said sales call.

69.     Lee was confronted about this behavior and admitted to meeting with Scheeler, Watson, and Bayless for BlueLogic business purposes while he was still employed at Enevive.

70.     Lee, since departing Enevive, has become more open about his involvement with BlueLogic, appearing in multiple BlueLogic social media posts and even leaving a five-star

17

Google review for BlueLogic. Screenshots of one of these posts and the review are included

below for reference.



Lee posing with BlueLogic Personnel. In the row of men behind the man taking the picture, the
second individual from the right is Lee.



*Post-termination Recruitment of Other Enevive Employees*

71.    On August 8, 2025, Melanie Shumway ("Ms. Shumway"), Sales Director at Enevive, was approached by Adams at a networking event where he divulged to her that BlueLogic was fully operational, working out of a warehouse provided by a one-time Enevive client, and using Enevive employees, like Trevor Lee, to make sales for the company.

72.     Adams in the same conversation tried to recruit Ms. Shumway to come work for BlueLogic.

*Trade Dress and Trademark Infringement*

73.     While employed at Enevive, Scheeler had done work on designing Enevive's website. *See ¶ 15, supra.*

74.     As of August 11, 2025, BlueLogic's website (bluelogicwater.com) borrowed heavily from Enevive's website's aesthetic, including: content, pictures, layout, and color scheme. Screenshots of the bluelogicwater.com homepage taken before the time of filing for the initial complaint are included below.







75.     In addition to trade dress similarities illustrated through the websites of BlueLogic and Enevive, the BlueLogic logo also borrows heavily from Enevive's logo.

76.     Enevive has used its logo in commerce for seven years and currently has an active registered trademark for its logo.

77. Distinguishable elements of the Enevive logo include: a graphic of a water droplet divided in half by two colors, a bicolor palette including a shade of blue and an achromatic color, and the company name with each half rendered in a different color.

78. As is illustrated in the following screenshots of the two logos, all the previously listed distinguishable elements of Enevive's logo have been mimicked by BlueLogic's logo.

 

79. Through forming BlueLogic, and engaging in the behaviors stated above, Defendants have acted in unison to engage in this tortious and otherwise unlawful behavior.

80. Defendants' ongoing misappropriation, unfair competition, breach of contract, and otherwise unlawful conduct has resulted in lost revenue and profits for Enevive in an amount totaling no less than $250,000.00, plus reputational damages and damages to Enevive's goodwill in an amount to be determined through the course of discovery.

### FIRST CAUSE OF ACTION
(Unfair Competition – Against All Defendants)

81. Enevive hereby re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

82. Enevive and BlueLogic compete in the home water purification industry.

83. Defendants, as the managers of BlueLogic, attempt to pass off BlueLogic's goods and services as somehow distinct from Enevive.

22

84. Defendants seek to sell and market BlueLogic's goods and services in a deceptive manner.

85. Specifically:

    a. Defendants have created a brand that substantially mimics, without limitation, Enevive's water purification systems, marketing strategies, installation techniques, website, etc.

    b. Scheeler admitted his intent to create "Enevive 2.0" to other Enevive employees while Defendants were still employed by Enevive.

    c. Defendants recruited Enevive employees and used Enevive employees to sell BlueLogic products.

    d. After admitting intent to create "Enevive 2.0" and interfering Enevive's employees, Defendants directly contacted Enevive brand partners to sell BlueLogic products.

86. Defendants' actions and intent are enough to establish a probability of confusion or deception among Enevive's target market, such that they would be misled.

87. As a result of Defendants' conduct, Enevive has experienced damages, including lost profits and reputational damage.

88. Defendants' conduct presents immediate harm to Enevive beyond any monetary damages as the potential damage to Enevive's reputation and relationships with customers are threatened by BlueLogic's attempt to palm off Enevive's brand.

89.     Enevive requests the Court grant Enevive injunctive relief, prohibiting Defendants from further conduct constituting unfair competition or "palming off", and damages in an amount to be determined at trial plus all applicable interest and attorney fees.

## SECOND CAUSE OF ACTION
(Statutory Unfair Competition – Utah Code § 13-5a-103 – Against All Defendants)

### Count One – Trademark Infringement

90.     Enevive hereby re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

91.     In forming BlueLogic, Defendants created a logo that substantially borrows from Enevive's trademarked logo.

92.     BlueLogic's logo borrows from Enevive's logo by adopting a graphic of a water droplet divided in half, a bicolor palette including a shade of blue and an achromatic color, and the company name with each half rendered in a different color.

93.     Defendants have placed BlueLogic's logo on their website and BlueLogic's actual filtration system.

94.     Defendants have actively tried to sell their products through Enevive brand partners.

95.     Defendants' borrowing from Enevive's logo is likely to generate confusion, as BlueLogic places their logo out in the marketplace through their website and on their products themselves, and has even tried to sell their product to Enevive's own brand partners.

96.     Defendants' attempt to substantially borrow from Enevive's trademark to sell to Enevive's own customers is unfair and unlawful.

24

97. Defendants' conduct has led to a material diminution in the value of Enevive's trademark, through decreased sales, loss of distinctiveness, and damages to Enevive's brand reputation among its customers and the market in general.

98. Defendants' infringement on Enevive's trademark has resulted in actual damages to the Enevive, including lost profits and reputational damages.

***Count Two – Predatory Hiring Practices***

99. While working at Enevive, Scheeler made promises to and tried to recruit Enevive employees to come work for "Enevive 2.0."

100. Adams approached Enevive's sales director, Ms. Shumway, and attempted to recruit her to join BlueLogic.

101. Lee made sales for BlueLogic at the request of the other Defendants while still an Enevive employee.

102. These actions indicate a scheme to deprive Enevive of its workforce and are predatory in nature.

103. Defendants' attempt to deprive Enevive of its workforce is unfair and unlawful and resulted in increased expenses for Enevive in training and maintaining its workforce and decreases the value of Enevive's trademark.

104. As a result of Defendants' multiple counts of Unfair Competition, the Enevive is entitled to damages in an amount to be determined at trial including costs and attorney fees.

105. The Enevive, due to the severity of Defendants' conduct, is also entitled to an award of appropriate punitive damages as well, in accordance with Utah Code § 13-5a-103(1)(b)(iii).

**THIRD CAUSE OF ACTION**

(Misappropriation of Trade Secrets – 18 U.S.C. § 1836(b) – Against All Defendants)

106. Enevive hereby re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

107. Since at least 2017, Enevive has developed and owned confidential and proprietary business information, including without limitation:

    a. research conducted by Enevive on water filtration in residential areas;

    b. Envive's engineering designs for custom residential filtration systems such as Enevive's Ultimate Water Protocol (Full House Purification) High Capacity Reverse Osmosis Systems;

    c. installation of flow through emergency water storage, continually rotated with use to the home;

    d. a unique and Enevive specific sales methodology including virtual meetings and customer education on the dangers of water softeners;

    e. price points and cost configurations of full home purification using Enevive's technology;

    f. an Enevive specific nationwide expansion plan approaching brand partners who are initially approached for a first installation of Enevive products and then later are developed into brand partners who then generate leads for Enevive;

    g. Enevive's customer lists; and

    h. other proprietary business information (collectively, the "Trade Secrets").

108. The Trade Secrets are not known outside of Enevive, are not readily ascertainable, and combine to confer a competitive advantage worth millions of dollars in revenue.

109.   The Trade Secrets derive independent economic value from not being generally known or readily ascertainable by proper means and are subject to reasonable measures of secrecy, such as password protection, policies put in place by Enevive to not share the Trade Secrets with non-Enevive personnel or agreements entered by employees not to disclose this information.

110.   Enevive uses the Trade Secrets to sell residential home water purification systems in interstate commerce, selling to customers in states like Utah, Idaho, Arizona, Ohio, California, Hawaii, Iowa, and Virginia.

111.   Defendants had access to Enevive's trade secrets:

a.   Scheeler and Watson, in their respective roles had access to Enevive's entire front end and back end operation;

b.   Adams similarly was trained and had access to Enevive's Trade Secrets while employed at Enevive;

c.   Lee through his work as a consultant was privy to Enevive's Trade Secrets; and

d.   Bayless was responsible for managing and training Enevive techs and received similar training related to Enevive's Trade Secrets.

112.   Scheeler and Watson, while employed at Enevive, were under an obligation to not use Enevive's Trade Secrets in a way that would negatively impact Enevive or its place in the market based on employment contracts and non-disclosure agreements which covered the Trade Secrets.

113.    Bayless, Lee, and Adams were subject to Non-disclosure and Non-compete agreements both during and after their terms of employment with Enevive, giving rise to a duty not to share or misuse Enevive's Trade Secrets.

114.    BlueLogic was comprised of the individual Defendants and should have known this information was not to be used in a way to harm Enevive or at least that the individual Defendants were under an obligation not to disclose or misuse it.

115.    Beginning in or around April 2025, and continuing thereafter, without precluding other potential examples of misappropriation, Defendants, improperly disclosed and used the Trade Secrets without Enevive's consent in the following ways:

a.  Defendants lacked experience in the home water purification industry prior to their employment with Enevive;

b.  Defendants used their knowledge of Enevive's research to help with their sales tactics;

c.  Defendants used their knowledge of Enevive's designs for products such as Enevive's Ultimate Water Protocol (Full House Purification) High Capacity Reverse Osmosis Systems to generate their designs;

d.  Defendants used their knowledge of Enevive's price points to ensure they sell their product at a lower cost than Enevive; and

e.  Defendants used their knowledge of Enevive's private customer lists and lead generation software to target Enevive customers and trade partners.

116.    Defendants' conduct in copying and using Enevive's Trade Secrets to target Enevive's own customers and brand partners is evidence of a willful and malicious scheme to improperly reap the benefits of Enevive's proprietary information.

117.    Defendants' conduct has caused lost profits, reputational damage, and diminution in the value of the Trade Secrets, and ongoing unjust enrichment.

118.    Pursuant to 18 U.S.C. § 1836(3)(A), Enevive is entitled to lawful injunctive relief to prevent further misappropriation of the Trade Secrets and affirmative action to protect the Trade Secrets.

119.    Pursuant to 18 U.S.C. § 1836(b)(3), Enevive is entitled to damages adequate to compensate for actual loss or unjust enrichment (or, in the alternative, a reasonable royalty) in an amount over $1,000,000.00, plus all applicable interest, and reasonable attorney fees.

120.    Pursuant to 18 U.S.C. § 1836(b)(3)(C), inasmuch as Defendants' conduct is willful and malicious, Enevive asks this court to grant an award of exemplary damages in an amount no greater than double the amount awarded to Enevive in actual damages.

## FOURTH CAUSE OF ACTION
(In the alternative, Misappropriation of Trade Secrets – Utah Code § 13-24-1 et seq. – Against All Defendants)

121.    Enevive hereby re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

122.    Since at least 2017, Enevive has developed and owned confidential and proprietary business information, including without limitation:

a.    research conducted by Enevive on water filtration in residential areas;

29

b. Envive's engineering designs for custom residential filtration systems such as Enevive's Ultimate Water Protocol (Full House Purification) High Capacity Reverse Osmosis Systems;

c. installation of flow through emergency water storage, continually rotated with use to the home;

d. a unique and Enevive specific sales methodology including virtual meetings and customer education on the dangers of water softeners;

e. price points and cost configurations of full home purification using Enevive's technology;

f. a firm specific customer list; and

g. an Enevive specific nationwide expansion plan approaching brand partners who are initially approached for a first installation of Enevive products and then later are developed into brand partners who then generate leads for Enevive.

123. The Trade Secrets, are not known outside of Enevive, are not readily ascertainable, and combine to confer a competitive advantage worth millions of dollars in revenue.

124. The Trade Secrets, as mentioned in Cause of Action Four, derive independent economic value from not being generally known or readily ascertainable by proper means and are subject to reasonable measures of secrecy, such as password protection, policies put in place by Enevive to not share the Trade Secrets with non-Enevive personnel, or agreements entered into by employees not to disclose this information.

125. Defendants, through their efforts to use Enevive's Trade Secrets to create BlueLogic's product and marketing methods, sell products based on Enevive's Trade Secrets, have misappropriated Enevive's Trade Secrets.

126. Based on policies they were subject to during their employment with Enevive or the non-disclosure agreements and employment contracts entered by certain Defendants with Enevive, Defendants were under circumstances giving rise to a duty to maintain their secrecy or limit their use.

127. As a result of Defendants' improper use of the Trade Secrets, Enevive has suffered lost profits, reputational harm, and diminution in the value of its Trade Secrets.

128. Pursuant to Utah Code § 13-24-3, Enevive is entitled to injunctive relief to prohibit further misappropriation of Enevive's trade secrets and affirmative acts to protect its Trade Secrets.

129. Pursuant to Utah Code §§ 13-24-4(1), Enevive is entitled to damages adequate to compensate for actual loss or unjust enrichment (or, in the alternative, a reasonable royalty) in an amount over $1,000,000.00, plus applicable interest.

130. Pursuant to Utah Code § 13-24-4(2), inasmuch as Defendants' conduct is willful and malicious, Enevive is entitled to an award of exemplary damages in an amount no greater than double the amount awarded to Enevive in actual damages.

131. Pursuant to Utah Code § 13-24-5, inasmuch as Defendants' conduct is willful and malicious, Enevive is entitled to an award of reasonable attorney fees.

## FIFTH CAUSE OF ACTION
(Breach of Contract – Against  Scheeler, Adams, Watson, Lee, and Bayless)

31

132.    Enevive hereby re-alleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

133.    Scheeler, Watson, Adams, Lee, and Bayless agreed to certain terms as governed by their respective employment contracts and non-disclosure agreements:

    a.    Scheeler, while employed at Enevive, agreed to abide by the guidelines outlined in the employee handbook and signed a non-disclosure agreement, both agreements addressed guidelines on confidentiality;

    b.    Scheeler and Watson were also under a general obligation as employees of Enevive not to take any action to harm Enevive; and

    c.    Adams, Lee, and Bayless, based on their respective employment and non-disclosure agreements were under obligations not to disclose or misuse Enevive's proprietary information in any way without Enevive's consent.

134.    Under their employment contracts and non-disclosure agreements, Scheeler, Watson, Adams, Lee, and Bayless had the obligation to execute their respective roles at Enevive and Enevive had the obligation to provide compensation.

135.    Throughout their employment at Enevive, Enevive provided compensation to Scheeler, Watson, Adams, Lee, and Bayless.

136.    Scheeler and Watson formed BlueLogic prior to their termination at Enevive, using Enevive's proprietary information to create their business, in violation of their employment contracts and obligations.

137.    Adams, Lee, and Bayless breached their agreements by using Enevive's proprietary information to help in the growth of BlueLogic.

138.     Furthermore,  Scheeler, Watson, Adams, Lee, and Bayless formed and participated in BlueLogic, using Enevive's Trade Secrets, to directly compete with Enevive in violation of their respective contracts and non-disclosure agreements.

139.      Scheeler, Watson, Adams, Lee, and Bayless' failure to adhere to these provisions constitutes a breach of contract.

140.     As a result of  Scheeler, Watson, Adams, Lee, and Bayless' breach of contract, Enevive has been damaged in an amount to be determined at trial plus all applicable interest and attorney fees.

### SIXTH CAUSE OF ACTION
(In the Alternative – Breach of Implied Covenant of Good Faith and Fair Dealing – Against  Scheeler, Adams, Watson, Lee, and Bayless)

141.     Enevive hereby realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

142.     As a matter of law, an implied covenant of good faith and fair dealing is inherent in the respective employment and non-disclosure agreements entered by Enevive and  Scheeler, Watson, Adams, Lee, and Bayless.

143.     Pursuant to the covenant of good faith and fair dealing, the Parties have an obligation to not act in a way that prevents the other party from receiving the benefits contemplated in the employment and non-disclosure agreements.

144.     Enevive performed its obligation to not act in a way that prevents  Scheeler, Watson, Adams, Lee, and Bayless from receiving the benefits contemplated in the employment and non-disclosure agreements by providing compensation.

145.     Scheeler, Watson, Adams, Lee, and Bayless failed to perform their obligations to not act in a way that prevents Enevive from receiving the benefits contemplated in the employment and non-disclosure agreements.

146.     Scheeler, Watson, Adams, Lee, and Bayless' conduct in forming BlueLogic and participating in its business operations constitutes a willful failure to cooperate in fulfilling the employment and non-disclosure agreements.

147.     Scheeler, Watson, Adams, Lee, and Bayless' conduct in recruiting Enevive employees and using Trade Secrets to sell BlueLogic products constitutes a willful failure to cooperate in fulfilling the employment and non-disclosure agreements.

148.     Scheeler, Watson, Adams, Lee, and Bayless' failure to cooperate in performing their obligations under the employment and non-disclosure agreements prevented Enevive from receiving the benefit of effective management of Enevive operations.

149.     As a direct and proximate result of  Scheeler, Watson, Adams, and Bayless' breach of the implied covenant of good faith and fair dealing, Enevive has incurred damages in the amount to be determined at trial plus all applicable interest and attorney fees.

## SEVENTH CAUSE OF ACTION
(In the Alternative – Unjust Enrichment – Against All Defendants)

150.     Enevive hereby realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

151.     Defendants received the benefit of using the sales services of Enevive employees in an improper way.

34

152. Defendants contacted employees of Enevive that they knew still actively worked for Enevive, one of these employees being Lee, and encouraged them to sell BlueLogic products while still actively working for Enevive without informing Enevive.

153. Lee was a W2 employee of Enevive when he was approached by BlueLogic to sell BlueLogic's product.

154. Lee formed an agreement with BlueLogic where he sold products for BlueLogic while still being employed by Enevive.

155. Enevive did not receive any compensation for the sales made by Lee on behalf of BlueLogic.

156. Enevive was unaware of Lee selling product for BlueLogic and did not consent to its employee selling a similar product to its own for a direct competitor.

157. Additionally, Defendants sought to unjustly establish business relationships with important product partners of Enevive through leveraging existing business relationships established by Enevive.

158. Specifically, Defendants contacted two out-of-state vendors with whom Enevive has long-standing relationships and attempted to persuade them to switch their business over to BlueLogic without compensating Enevive.

159. Defendants used Lee and Enevive's established business relationships with these vendors to develop BlueLogic's business.

160. It would be unjust for Defendants to retain the foregoing benefits obtained from Enevive without conferring the benefit of full payment for such on Enevive.

161. Defendants are enjoying and retaining the foregoing benefits without conferring the benefit of full payment on Enevive.

162. To permit Defendants to continue in retaining the foregoing benefits would result in an unjust enrichment of Defendants at Enevive's expense.

163. The cost to Enevive of procuring the foregoing benefits currently enjoyed by Defendants is an amount to be determined at trial plus all applicable interest.

## EIGHTH CAUSE OF ACTION
(Trademark Dress Infringement – Lanham Act 15 U.S.C. § 1125(a) – Against All Defendants)

164. Enevive hereby realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

165. Since at least 2017, Enevive has fostered a unique brand including its distinct website and logo.

166. Enevive has used this logo in interstate commerce, using its website to establish its online presence throughout the United States and using its logo on its products which it sells in states such as Utah, Idaho, Arizona, Ohio, California, Hawaii, Iowa, and Virginia.

167. Enevive's website, enevive.com, includes distinct images, color scheme, content, and layout.

168. Enevive's logo also includes specific, distinctive elements and Enevive has used this logo in commerce for at least seven years.

169. Defendants have substantially borrowed from Enevive's branding, including website aesthetic and logo since April 2025.

   a. Defendants' website, bluelogicwater.com, borrows heavily from enevive.com's images, color scheme, content, and layout.

b. Defendants' logo borrows heavily from Enevive's logo, including the shared distinctive elements of a graphic of a water droplet divided in half, a bicolor palette including a shade of blue and an achromatic color, and the company name with each half rendered in a different color.

170. Defendants' use of Enevive's brand is of a sufficiently similar design to create a significant likelihood of confusion within their intended customer-base.

171. Defendants' use of Enevive's brand to sell directly to Enevive customers and brand partners misrepresents the nature and characteristics of the goods and services they allege to provide.

172.  Scheeler, Watson, Adams, Lee, and Bayless  have all participated in conduct that infringes on Enevive's trade dress, including, among other things: selling BlueLogic products using trade dress that copies Enevive's brand, advertising for BlueLogic using trade dress that copies Enevive's brand, and copying Enevive's brand while participating in the designing process of BlueLogic's trade dress.

173. Enevive has suffered and faces additional imminent and irreparable harm to their reputation and goodwill due to Defendants' infringement of their trade dress.

174. Enevive is entitled to injunctive relief in the form of an order from the Court prohibiting Defendants from the use of any portion of Enevive branding in their course of business and an award of damages in an amount to be proven at trial, plus all applicable interest and attorney's fees.

**<u>NINTH CAUSE OF ACTION</u>**
(Conversion – Against  Scheeler and Watson)

175.    Enevive hereby realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

176.    Since at least 2017, Enevive has utilized firm specific software to conduct daily business operations, including lead generation.

177.    While employed with Enevive, and for a brief period following their termination, Scheeler and Watson had access to all firm specific software.

178.    Scheeler was terminated from Enevive on May 29, 2025, for conduct that worked to exclude the Enevive members from important business decisions, and Watson resigned the same day to follow Scheeler.

179.    After May 29, 2025, Enevive employees were unable to use or access the firm software that allowed for lead generation.

180.    Enevive never had any significant issues with using or accessing the lead generation software before this instance.

181.    The specific damage caused to the lead generation software is likely to occur only as the result of intentional and physical tampering.

182.    Upon being terminated from Enevive, Scheeler and Watson had no right to access or modify Enevive's firm specific software.

183.    Upon information and belief, this deprivation of Enevive employees of the ability to access the lead generation software was a result of an unauthorized act by Scheeler and Watson, specifically that they used their knowledge and access to Enevive's software to manipulate the code in such a way that Enevive was unable to use the software to generate leads.

184. Any action taken by Scheeler and Watson to deprive Enevive employees' access to lead generation software demonstrates intent to exercise control over the lead generation software inconsistent with Enevive's rights.

185. Enevive has been damaged in an amount no less than the value of the software capabilities it has been deprived of plus reasonable interest.

186. As a direct and proximate result of Scheeler and Watson's conversion, Enevive has incurred damages in an amount to be determined at trial but plus all applicable interest and attorney fees.

**TENTH CAUSE OF ACTION**
(Intentional Interference with Economic Relations – Three Counts)

*Count One – Interference with Lead Generation Software – Against Scheeler and Watson*

187. Enevive hereby realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

188. While employed with Enevive, Scheeler and Watson had direct access to Enevive's lead generation software.

189. Scheeler and Watson knew that Enevive relies on their lead generation software to obtain client leads that often turn into actual clients.

190. Scheeler and Watson knew that Enevive needed to maintain a flow of new clients to generate revenue and sustain the business.

191. Scheeler and Watson were involuntarily terminated from Enevive on May 29, 2025, for employee misconduct.

192. In June of 2025, following the termination of Scheeler and Watson, all leads being generated by Enevive's lead generation software suddenly halted.

193.    Enevive never had any issues with using or accessing the lead generation software before this instance.

194.    The specific damage caused to the lead generation software is likely to occur only as the result of intentional and physical tampering.

195.    Upon being terminated from Enevive,  Scheeler and Watson had no right to access or modify Enevive's firm specific software.

196.    Upon information and belief, the halting of the lead generation software was a direct result of technical manipulation by Scheeler and Watson, specifically that they used their knowledge and access to Enevive's software to manipulate the code in such a way that Enevive was unable to use the software to generate leads.

197.    Enevive was directly harmed because of the halting of the lead generation software as this caused a stoppage in the influx of new clients for Enevive, resulting in lost revenue.

***Count Two – Interference with Relationships with Brand Partners – Against All Defendants***

198.    Additionally, while employed with Enevive, Defendants became knowledgeable about important business relationships Enevive had with product partners that were essential to the business structure of Enevive.

199.    After forming BlueLogic, Defendants Enevive's product partners and already established relationships to persuade these partners to cease doing business with Enevive and instead partner with BlueLogic.

200.    Enevive's relationships with these product partners has been harmed by Defendants attempting to poach these associates.

201.    Enevive's relationships with these product partners has also been harmed by the confusion resulting in former Enevive employees persuading the partners to engage with a different company that conducts the same business as Enevive.

*Count Three – Interference with Enevive Employees – Against All Defendants*

202.    BlueLogic contacted employees of Enevive that BlueLogic was aware still actively worked for Enevive and encouraged them to sell BlueLogic products without informing Enevive.

203.    BlueLogic used employees that were actively employed by Enevive, including Defendant Lee, to sell their product without compensating Enevive.

204.    Enevive suffered lost profits because employees, that at the time were still working for Enevive, were being used to sell their same product for the financial benefit of a direct competitor, without receiving any compensation.

205.    Enevive has been damaged in an amount no less than the value of all lost profits and reputational damages caused by Defendants' interference.

206.    As a direct and proximate result of Defendants' intentional interference with economic relations, Enevive has incurred damages in an amount to be determined at trial plus all applicable interest and attorney fees.

### ELEVENTH CAUSE OF ACTION
(Civil Conspiracy – Against All Defendants)

207.    Enevive hereby realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

208.     Scheeler, Watson, Adams, Lee, and Bayless were former employees at Enevive.

41

209.     As evidenced by their words and conduct before and after employment at Enevive,  Scheeler, Watson, Adams, Lee, and Bayless had the object to use Enevive Trade Secrets and knowledge of Enevive's business and business relationships to form a direct competitor to Enevive.

210.     Scheeler first expressed the intent to form BlueLogic as a direct competitor to Enevive by stating on multiple occasions while he was still employed with Enevive that he was going to create "Enevive 2.0" and manage the new company without involving Trent and Teresa Spafford.

211.     Scheeler recruited Watson, a colleague he trusted and that others around them understood to be closely associated with him, to assist in forming BlueLogic.

212.      Scheeler and Watson recruited  Adams and Bayless to also participate in different capacities in the formation and business operations of BlueLogic.

213.      Adams and Bayless willingly joined  Scheeler and Watson in the process of forming BlueLogic.

214.      Scheeler, Watson, Adams, and Bayless recruited Lee to join BlueLogic after persuading Lee to sell BlueLogic products while still employed with Enevive.

215.     Lee, after being confronted about working for BlueLogic while being an Enevive employee, ceased employment with Enevive and willingly joined the other Defendants in the formation of and daily operations of BlueLogic.

216.      Scheeler, Watson, Adams, Lee, and Bayless established BlueLogic to accomplish the object of forming a direct competitor to Enevive.

217.     In establishing and maintaining BlueLogic,  Scheeler, Watson, Adams, Lee, and Bayless conspired in bringing to pass multiple unlawful acts, including without limitation: Unfair Competition, Misappropriation of Trade Secrets, Intentional Interference with Economic Relations, Breach of Contract, Conversion, Unjust Enrichment, Trade Dress Infringement, etc.

218.     As a result of the Defendants stated unlawful means, Enevive has suffered actual and reputational damages in an amount to be determined at trial plus all applicable interest and attorney fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Enevive respectfully requests the Court enter judgement against Defendants as follows:

1. As to the First Cause of Action, an injunction against Defendants prohibiting their unfair competitive conduct and a judgment in favor of Enevive for general and compensatory damages resulting from Defendants' unfair competition.

2. As to the Second Cause of Action, a judgment in favor of Enevive for general and compensatory damages resulting from Defendants' Statutory Unfair Competition pursuant to Utah Code § 13-5a-103.

3. As to the Third Cause of Action, an injunction against Defendants prohibiting their misappropriation and requiring their affirmative action to protect the Trade Secrets;

   a.   A judgment in favor of Enevive for general and exemplary damages resulting from Defendants' willful and malicious Misappropriation of Trade Secrets pursuant to 18 U.S.C. § 1836.

4. As to the Fourth Cause of Action, an injunction against Defendants prohibiting their misappropriation and requiring their affirmative action to protect the Trade Secrets;

    a. A judgment in favor of Enevive for general and exemplary damages resulting from Defendants' willful and malicious Misappropriation of Trade Secrets pursuant to Utah Code § 13-24-1 et seq.

5. As to the Fifth Cause of Action, a judgment in favor of Enevive for general and compensatory damages resulting from Defendants' breach of contract.

6. As to the Sixth Cause of Action, a judgment in favor of Enevive for general and compensatory damages resulting from Defendants' breach of the implied covenant of good faith and fair dealing.

7. As to the Seventh Cause of Action, a judgment in favor of Enevive for the value of the benefit conferred on Defendants.

8. As to the Eighth Cause of Action, an injunction against Defendants prohibiting their continued Trade Dress Infringement;

    a. A judgment in favor of Enevive for general and compensatory damages resulting from Defendants' Trade Dress Infringement pursuant to 15 U.S.C. § 1125(a).

9. As to the Ninth Cause of Action, an injunction against Defendants prohibiting their continued use of proprietary business information on Enevive.

    a. A judgment in favor of Enevive for general and compensatory damages resulting from Defendants' breach of fiduciary duty.

10. As to the Tenth Cause of Action, a judgment in favor of Enevive for the value of the software capabilities it has been deprived of because of Defendants' Conversion.

11. As to the Eleventh Cause of Action, a judgment in favor of all revenue lost by Enevive because of Defendants' intentional interference with economic relations.

12. As to the Twelfth Cause of Action, a judgment in favor of Enevive for general and compensatory damages resulting from Defendants' civil conspiracy.

13. Any further relief as the Court deems just and equitable under the circumstances including attorney fees where applicable, punitive damages, and pre- and post-judgment interest.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Enevive demands trial by jury in this action to all issues so triable.

DATED: November 25, 2025.

**SUMSION BUSINESS LAW**

*/s/ Steven R. Sumsion*

Steven R. Sumsion
*Attorney for Plaintiff*

45

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2025, I caused a true and correct copy of the foregoing **FIRST AMENDED COMPLAINT** with the Court's e-filing system, causing notice to be served on all parties who have appeared in this action.

**SUMSION BUSINESS LAW**

*/s/ Isaac Tanner*
Isaac Tanner
*Paralegal*